22-861(L)
*United States v. Mangano*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2023

(Argued: February 15, 2024        Decided: February 13, 2025)

Docket Nos. 22-861(L), 22-937(Con)

_____

UNITED STATES OF AMERICA,

*Appellee,*

-v.-

LINDA MANGANO, EDWARD MANGANO,

*Defendants-Appellants.*[*]

_____

Before:      LIVINGSTON, *Chief Judge,* LYNCH and ROBINSON, *Circuit Judges.*

Defendant-Appellant Edward Mangano ("Mangano") challenges his convictions for conspiracy to commit federal programs bribery and honest services fraud and the related substantive offenses.  Mangano and his wife,

---

[*] The Clerk of Court is respectfully directed to amend the official caption as set forth above.

Defendant-Appellant Linda Mangano ("L. Mangano"), also challenge their convictions for conspiracy to obstruct justice. L. Mangano separately challenges her convictions for obstruction of justice and making false statements to federal officials. We conclude that the district court properly instructed the jury as to the conspiracies to commit honest services fraud and obstruction of justice, as well as the related principal offenses, and that the evidence was sufficient to convict the Defendants-Appellants as to those charges. We also hold that the evidence was sufficient to convict L. Mangano of false statements. However, we conclude that the evidence was insufficient to convict Mangano of conspiracy to commit federal programs bribery or the related substantive offense. Accordingly, the judgment of the district court is REVERSED in part and AFFIRMED in part, and we REMAND the case for further proceedings consistent with this opinion.

FOR UNITED STATES:                    CATHERINE M. MIRABILE (Christopher C.
                                      Caffarone, Amy Busa, David C. James,
                                      Assistant United States Attorneys, *on the
                                      brief*), *for* John J. Durham, United States
                                      Attorney for the Eastern District of New
                                      York, Central Islip, NY.

FOR DEFENDANTS-APPELLANTS:             MORRIS J. FODEMAN (Jessica R. Lonergan,
                                      Alexander L. Luhring, *on the brief*), Wilson
                                      Sonsini Goodrich & Rosati, P.C., New York,
                                      NY; Paul N. Harold (Kelsey J. Curtis, *on the
                                      brief*), Wilson Sonsini Goodrich & Rosati,

2

P.C., Washington, D.C.; FRED A. ROWLEY, JR. (*on the brief*), Wilson Sonsini Goodrich & Rosati, P.C., Los Angeles, CA, *for Edward Mangano*.

BRADLEY D. SIMON (Michael A. Brodlieb, John Moore, *on the brief*), Schlam Stone & Dolan LLP, New York, NY, *for Linda Mangano*.

DEBRA ANN LIVINGSTON, *Chief Circuit Judge*:

This case is about public corruption. On April 19, 2022, following a jury trial in the United States District Court for the Eastern District of New York (Azrack, *J.*), Defendant-Appellant Edward Mangano ("Mangano") was convicted of conspiring to accept and of accepting illegal bribes while serving as the County Executive of Nassau County, New York, in violation of statutes that prohibit honest services wire fraud and federal programs bribery, 18 U.S.C. §§ 1343, 1346, 1349, 666(a)(1)(B). Together with his wife and co-defendant, Defendant-Appellant Linda Mangano ("L. Mangano"), Mangano was also convicted of conspiring to obstruct a federal grand jury investigation into the bribes, in violation of 18 U.S.C. §§ 1512(c)(2), (k). L. Mangano was separately convicted of obstructing a federal grand jury investigation, in violation of 18 U.S.C. § 1512(c)(2), and of making false statements to a federal agent, in violation of 18

3

U.S.C. § 1001(a)(2). For these crimes, the district court sentenced Mangano principally to 12 years' imprisonment and L. Mangano to 15 months' imprisonment.

On appeal, the Defendants-Appellants challenge their convictions and sentences on numerous grounds. While we address several of these arguments in a separate summary order filed today, in this opinion, we address the Defendants-Appellants' arguments relating to their respective convictions for federal programs bribery, honest services fraud, and obstruction of justice.[1] Specifically, we consider whether the evidence was sufficient to convict Mangano of federal programs bribery and a related conspiracy involving actions taken by the Town of Oyster Bay ("Town"), notwithstanding the fact that the government repeatedly conceded that Mangano was not an agent of the Town. We conduct the same sufficiency of the evidence analysis regarding Mangano's honest services fraud and related conspiracy convictions, and we examine whether the

---

[1] In a separate summary order filed today, we reject additional challenges by the Defendants-Appellants and hold that 1) the government did not commit misconduct during its rebuttal argument, 2) the district court did not abuse its discretion in denying Mangano's motion to vacate the judgment of his conviction based on alleged perjury by a witness, and 3) the district did not err in calculating L. Mangano's sentence. *See United States v. Mangano*, Nos. 22-861(L), 22-937(Con) (2d. Cir. February 13, 2025) (summary order).

4

jury was properly instructed as to those charges. We then review the sufficiency of the evidence and the jury instructions as to the Manganos' convictions for conspiracy to obstruct justice and L. Mangano's conviction for obstructing justice. Finally, we examine the sufficiency of the evidence as to L. Mangano's convictions for false statements.

We conclude that the evidence was insufficient to support Mangano's convictions as to federal programs bribery and the related conspiracy. However, we reject his arguments related to honest services fraud and obstruction of justice. We also reject L. Mangano's arguments regarding her convictions for obstruction of justice and false statements. We therefore **REVERSE** the judgment as to Mangano's federal programs bribery and conspiracy to commit federal programs bribery convictions and otherwise **AFFIRM** the district court's judgments as to all other counts in the indictment, and **REMAND** to the district court for resentencing of Mangano.

## BACKGROUND

### I. Factual Background[2]

In 2009, the people of Nassau County ("County") elected Mangano to serve as their County Executive. These constituents live within the County's various internal municipalities, one of which is the Town, home to more than 300,000 County residents. As the County's highest elected official, Mangano enjoyed "tremendous political clout." A-1754.[3]

At the time of his election, Mangano maintained a friendship with Harendra Singh ("Singh"), a prominent businessman and restaurateur in the Long Island area where Nassau County is located. Singh met Mangano, an attorney, in the early 1990s in the context of Singh's efforts to resolve a dispute between one of his restaurants and a neighboring diner.

---

[2] "Because this is an appeal from a judgment of conviction entered after a jury trial, the . . . facts are drawn from the trial evidence and described in the light most favorable to the Government." *United States v. Silver ("Silver II")*, 948 F.3d 538, 546 n.1 (2d Cir. 2020) (internal citation omitted).

[3] Citations to the record are as follows: "A" and "SPA" signal the appendix and special appendix which Mangano filed. "JA" and "SA" signal the joint appendix and special appendix which L. Mangano filed. "GX" signals an exhibit introduced into evidence by the government, and "DX" signals an exhibit introduced into evidence by the defense.

Over the first 25 years of their friendship, Singh never gave anything of significant value to Mangano or his family. But once Mangano was elected as County Executive, Singh began plying his newly powerful friend with lavish gifts. At trial, the government produced evidence that, between 2009 and 2015, Singh gave Mangano, among other things: a custom-made office chair worth approximately $2,700; roughly $42,000 as a discount on food for Mangano's campaign; a massage chair worth over $3,600; over $20,000 in vacation expenses and hardwood flooring for the Manganos' house; and approximately $7,000 to be spent on a luxury watch for the Manganos' son.

Most notably, in April 2010, Singh hired L. Mangano at a yearly salary of approximately $100,000 for a "no-show" job. This job continued until August 2014, when the Federal Bureau of Investigation ("FBI") executed a search warrant at Singh's offices in connection with a bribery investigation that culminated in this case. Singh testified that he agreed to hire L. Mangano after Mangano revealed that leaving his law firm job to serve as County Executive had resulted in a pay cut of over $100,000 per year for his household. "[T]o replace that difference," Mangano asked Singh to put L. Mangano on the payroll of one of Singh's restaurants that did not do business with the Town or County. A-1157,

A-1253. Singh did just that. He hired L. Mangano as a "director of marketing" at Water's Edge, a restaurant and event venue he owned in Queens, New York. A-1248, A-1253. Singh testified that this "no show job" was "given to [L. Mangano] at the request of Ed Mangano" so that she could get paid without "doing any work." A-1249. Indeed, just six days after "hiring" L. Mangano to serve as marketing director at Water's Edge, Singh placed an advertisement seeking a marketing and advertising manager at the same location.

At trial, the government argued that Mangano agreed to accept Singh's gifts, including the paychecks from L. Mangano's no-show job, in return for official actions that Mangano undertook as the County Executive regarding two distinct bribery schemes: one involving the Town guaranteeing millions of dollars in loans on Singh's behalf, and the other involving County contracts that Mangano allegedly steered to Singh's businesses. The government also argued that, when a federal grand jury began to examine the relationship between Singh and the Manganos, the Manganos and Singh conspired to obstruct the investigation by having L. Mangano make false statements to federal law enforcement agents about her no-show job.

8

## A. The Town Loan Guarantees Scheme[4]

The Town loan guarantees scheme stemmed from Singh's licenses to operate two Town-owned concession facilities: the Woodlands ("Woodlands"), near a Town golf course, and TOBAY Beach ("Beach"), at a Town beach. Singh first obtained these licenses in the late 1990s and mid-2000s, and the government presented evidence that he retained them over the ensuing years thanks to bid rigging by certain Town officials, including John Venditto ("Venditto"), the Town Supervisor from 1998 through the events at issue; Len Genova ("Genova"), the Town Attorney from 2010 through the events at issue (and previously the Town Deputy Supervisor); and Fred Mei ("Mei"), the Deputy Town Attorney through the events at issue. As Supervisor, Venditto sat on the Town Board, where votes on Town Resolutions—such as those which authorized him to enter into the concession agreements with Singh—were routinely unanimous and in line with his desires.[5] As Deputy Supervisor and, later, Town Attorney, Genova was "the

---

[4] The parties stipulated that the Town "is a local government entity that received benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee or other form of federal assistance in each of the one-year periods between 2010 and 2015." A-1748; GX 1000.

[5] The government produced evidence that, in connection with the Town concession contracts and other Town business, Singh bribed Venditto, Genova, and Mei with, among other things: free limousine rides and discounted parties and food to Venditto and Genova; $70,000 in cash to Mei; payments for Mei's BMW car lease, totaling

9

only person other than Venditto that could execute documents on behalf of the Town." A-1761. Mei, the Deputy Town Attorney, was responsible for drafting and managing the Town's agreements, including those with Singh.

Singh's licenses obliged him to make certain improvements to the Town concessions he operated. More specifically, the 2005 iteration of the Woodlands contract required Singh to make approximately $2.1 million in improvements at that location; he had already made $4.6 million in additional improvements. The 2005 iteration of the Beach contract required Singh to make $1 million in improvements at that location by 2015. Both agreements also contained clauses that allowed the Town to terminate them without cause, in which case Singh would receive payment up to 100% of the total value of his improvements. The Town Board later passed a resolution to amend the agreements such that, as of September 16, 2008, Singh had to perform an additional $3.25 million in improvements at the Woodlands and an additional $1.7 million in improvements at the Beach by April 30, 2015.

---

more than $18,000; and four overseas vacations for Mei.

### 1. Singh Seeks Loan Guarantees

In 2008, the same year that his obligations under the Town concession agreements increased by nearly $5 million, Singh purchased Water's Edge for $7.5 million. The transaction stretched Singh's finances right as the 2008 financial crisis began, leaving his businesses "at the brink of total collapse." A-1152. Desperate for capital—including capital that could help him fulfill his obligations at the Woodlands and the Beach—Singh sought loans from numerous financial institutions. None would loan him the funds he needed.

Then, Singh had an idea: "[I]f [the Town] guarantees my loan, with the [T]own's good credit[,] I would be able to get funding for these capital improvements at both facilities." A-1153. In January 2010, Singh raised this idea with Mangano, his recently-elected friend who now oversaw the entire County in which the Town sits. During a visit to Mangano's home, Singh asked Mangano to speak to Venditto about the Town guaranteeing loans for him. Although Singh had a "very, very good relationship" with Venditto, he felt that, as "the County Executive," Mangano enjoyed unique political capital that would ensure the guarantees' approval. A-1154. At Singh's urging, Mangano said he would "get it done," immediately contacted Venditto, and spoke with Venditto

11

by phone in Singh's presence.   A-1153–54.   After the call, Mangano told Singh, "[Venditto] is on board."   A-1154.

Later that same month, Singh rode in Mangano's official County Executive vehicle to a Republican Party event at a nearby country club.   At the event, Mangano confirmed that Venditto remained "on board with guaranteeing the loan to do the capital improvement at [Town] facilities" but that Singh should speak with him.   A-1154.   Singh then met Venditto outside the event, where Venditto told him that "Ed Mangano [is] very supportive of this loan guarantee and I'm going to support it.   We will do everything in our power to get it done for you."   A-1154–55.   A short time later, Genova and Mei met with Singh, repeating Venditto's assurances that "[Mangano] had spoken to [Venditto] and [both] are very supportive."   A-1155.

Singh thus began discussing with lenders the idea that the Town would guarantee any loans granted for his obligations at the Woodlands and the Beach— all the while "keeping [Mangano] updated" with the status of his "loan guarantee with [the Town]" because he "needed [Mangano's] support."   *Id.*   By March 2010, Mei told Singh that he had agreed with a potential lender regarding the

12

guarantees' language.   A-1156.   The "[T]own was ready to guarantee the loan."

*Id.*

But then the plan went sideways.   On March 10, 2010, the Town's outside counsel, Jonathan Sinnreich, advised that the proposed guarantees bore "substantial apparent constitutional and other infirmities."   GX 807. Specifically, Sinnreich highlighted how the New York Constitution bars local governments from guaranteeing loans for individuals.   *Id.* (citing N.Y. State Const. Art. VIII, § 1, which prohibits any town from "giv[ing] or loan[ing] its credit to or in aid of any individual, or private corporation or association, or private undertaking").   Moreover, the proposed guarantees contained "nothing that required [Singh] to spend any money that he obtained as a result of the town's guarantee on anything for the town.   He could spend it [on] whatever he wanted, . . . . [a]nd there was no control over how the money would be spent." A-1671.   Sinnreich also warned that there was no provision detailing what would occur if Singh defaulted on the bank loans at a time when he still owed the Town money.   *Id.*   "The proposed deal is too fraught with peril for the Town," Sinnreich concluded, because "it would subject the Town to genuine and substantial financial risk in the event of a default on the underlying loan (which

13

absolutely cannot be ruled out)." GX 807. As Sinnreich recalled at trial, "the deal that Mr. Singh wanted the [T]own to do was completely illegal and completely dangerous financially for the [T]own." A-1670.

Over the ensuing weeks, Mei tried to address Sinnreich's concerns while continuing to work on the loan guarantees scheme. On March 23, 2010, the Town Board adopted a resolution authorizing Venditto, as Supervisor, to "enter into a guarantee of payment" for Singh to make facility improvements at his two concessions. A-1755. Mei then proposed an agreement with a lender, Madison National Bank ("Madison"), but Sinnreich warned that it still bore "major legal/governmental/political issues that need to be considered before the Town signs on to this deal." GX821. Genova considered this to be a "red light." A-1756. On April 7, 2010, Mei forwarded Sinnreich's email to Singh. *Id.* "When I got this email," Singh testified, "I really was devastated . . . that, oh my God, this [loan guarantee] is not going to happen now." A-1157.

### 2. Singh Asks Mangano to Pressure the Town to Guarantee Loans

"[I]n total panic mode," Singh turned again to Mangano, seeking "to bypass" Sinnreich and Genova "and go to the highest level to get this thing back on track." *Id.* On a phone call with Mangano, Singh explained that "Sinnreich

14

is trying to come up with excuses not to get this loan done" and that he "really need[ed] [Mangano's] help" to avoid "a total disaster." *Id.* Mangano suggested that he could speak with his former law firm, Rivkin Radler, which could write a letter opining that the loan guarantee was legal, notwithstanding Sinnreich's concerns. *Id.* Mangano specifically offered to contact Bill Savino, his former boss at Rivkin Radler and the master of ceremonies at his County Executive inauguration.

### 3. Singh 'Hires' Linda Mangano for a No-Show Job

On April 9, 2010, just two days after learning that Sinnreich stymied the loan guarantee plan, Singh arranged a payment to L. Mangano to "make sure that [Mangano was] happy and . . . doing whatever needs to be done" to "make sure this loan gets back on track." A-1159. The paycheck purported to be L. Mangano's first income as a marketing director at Water's Edge, earning approximately $100,000 per year. In reality, her position was a "no show" job. A-1249. Notably, L. Mangano's annual "salary" matched the annual pay cut that Mangano told Singh he had endured at becoming County Supervisor. Singh testified that he hired L. Mangano, per Mangano's request, because the "major thing [Mangano] was working on" was "getting the loan guarantee, which [] the

15

survival of my entire company was depending on." A-1157. "I hired Linda Mangano because I needed this loan guarantee done from [the Town]. So when Ed [Mangano] was on board and supported this loan, when he requested me to help him financially, obviously it was a mutual benefit. So . . . I complied with [Mangano's request to hire Linda]." A-1158.

Mangano asked that his wife's employment be categorized as a W-2 position for tax purposes. As explained in more detail below, the evidence at trial showed that L. Mangano had no duties or responsibilities during the time she received paychecks from Water's Edge. Nevertheless, Mangano listed the job on his annual disclosures for the next four years as if it were a legitimate one, effectively hiding the true nature of the bribe.

#### 4. Mangano Pressures the Town to Guarantee Loans

Once Singh began paying L. Mangano for a no-show job, Mangano began leveraging his authority as County Executive to pressure the Town into guaranteeing the loans Singh needed. On April 13, just four days after L. Mangano received her first payment from Singh, Mangano spoke with Singh three times by telephone and then called Savino. After speaking with Savino,

Mangano called Singh back and told him that Rivkin would help compose an opinion letter to persuade the Town to guarantee the loans.

Savino's notes of the call that day show his understanding that Mangano wanted to create a way for the Town to guarantee loans to Singh by amending the existing concession agreements. Savino's notes specifically include the terms "terminable at will" and "extended to 2049"—the year when Singh's Woodlands agreement was set to expire. GX 423; A-1700. Singh's financial situation was noted with mentions to Singh's "multiple concessions," an initial "1.5m" loan that he needed the Town to guarantee, the fact that Singh "has a lot of risk," and that Singh was obliged to make capital improvements. *Id.* Savino also noted the fact that "Sinnreich" was "counsel," and the concern that the New York State Constitution "prohibits" the scheme such that the Town "can't call it a [guarantee]." *Id.*

That same day, Genova heard from Venditto that Mangano was pressuring the Town to work with Savino "to craft a resolution for Mr. Singh to get this [guarantee] done." A-1757–58. Genova felt this call was "a different direction" from Venditto, who had previously indicated that the guarantee "was a no-go" and that the Town would not back Singh's loans if "Sinnreich's concerns were not

17

addressed." *Id.* Venditto told Genova that, "based on his conversation with Ed Mangano," he was overruling Sinnreich and Genova's concerns about the legality of Singh's scheme. *Id.* Accordingly, Genova spoke to Savino the next day, advising him to talk with Mei to get more details on the proposed guarantees. Savino then brought in William Cornachio, a corporate partner at Rivkin, who began billing the Town for his efforts to solve Sinnreich's concerns. The following afternoon, Savino spoke once with Mangano and twice with Singh.

On April 28, 2010—two weeks after bringing in Rivkin Radler to help Singh—Mangano organized a meeting attended by Singh, Venditto, Genova, Mei, Sinnreich, Savino, Cornachio, Rob Walker (Mangano's Chief Deputy County Executive), and Rich Porchelli (Venditto's unofficial chief of staff). Mangano listed the meeting on his official County Executive calendar. Singh asked Mangano to be at the meeting because he believed Venditto "would listen to Ed Mangano a lot more than he would" to Singh, "especially when there [was] opposition within the administration." A-1160. Genova was not surprised that Mangano, the County Executive, was getting involved with this particular Town matter because the guarantees were "obviously . . . something [Mangano] wanted to get done." A-1759.

18

At the meeting, Mangano welcomed everyone and urged them to make Singh's guarantee scheme a reality. The Rivkin Radler attorneys gave Sinnreich the impression that they represented Singh's interests, not the Town interests that Sinnreich represented. Venditto chaired the discussion, which started with Sinnreich detailing his concerns about the proposed guarantees. Cornachio then engaged Sinnreich on the legal issues. At one point, Venditto asked Mangano if he could get jobs or promotions for some of Venditto's associates, which Mangano seemed open to doing. According to Genova, it seemed like "an opportune time for Venditto to ask [Mangano] for things he needed that were important to him." A-1760. Near the end of the meeting, Mangano, who had stood behind Singh throughout the discussion, put his hand on Singh's shoulder, and said, "Let's see if we can find a way to help Mr. Singh." A-1673. The meeting ended with Mangano encouraging Sinnreich, Savino, and Cornachio to continue the discussion and find a way to guarantee Singh's loans.

The day after the meeting, Mei emailed Sinnreich about an idea that Cornachio had for guaranteeing the loans Singh needed without violating the state constitution. Cornachio recognized that Singh's existing concession agreements provided Singh with a right to certain payments if the Town

19

terminated the deals without cause. By adding language authorizing payments to Singh even if the Town terminated the agreements *with* cause, Cornachio determined, the Town could effectively guarantee Singh's loans with third-party lenders. All it took was inserting language that provided the Town a right to terminate the concession agreement if Singh defaulted on his third-party loans. So long as the resulting payment equaled the guarantee sought by the lender, an assignment to the lender of Singh's right to the payment would effectively guarantee the loan. As consideration, Singh could sign a covenant not to sue in the event of such a no-cause termination.

Sinnreich told Mei and Genova that he thought Cornachio's proposal "was completely bogus and a sham and was not legal," marking the end of his involvement in the Town loan guarantees scheme. A-1674. Genova remained against the planned workaround and made his reservations clear, but he recognized that he had been "overruled" by "two of the most influential people in the County," Mangano and Venditto. A-1760.

### 5. The Town Guarantees Four Loans for Singh

On June 8, 2010, the Town Board unanimously voted to approve a new resolution authorizing the loan guarantees Singh needed. The initial March 23,

20

2010 resolution was unusable, according to Genova, because "it literally said guarantee of payment[,] which is unlawful." A-1760. The new, more vaguely-worded June 8, 2010 resolution stated that amending Singh's concession agreements was necessary "to facilitate the concessionaire's ability to obtain financing to make capital improvements to the facilities." A-479. The resolution therefore authorized Venditto, as Town Supervisor, to "execute amendments to [the Town's] agreements" with Singh, "as well as any other documents necessary to effectuate the purposes of [the] Resolution." *Id.* Genova understood the resolution to authorize "multiple" loans. A-1760. And so it did.

### a.      *The June 2010 $1.5 Million Beach Loan Guarantee*

The same day that the resolution passed, Venditto executed an amendment to Singh's Beach concession agreement with the Town that effectively guaranteed the $1.5 million line of credit that Madison granted Singh. It specifically added language providing for a $1.5 million payment from the Town to Madison in the event that the Town "terminate[d] the Agreement for any reason prior to April 30, 2015." A-481. Although the amendment stated that it was designed "in connection with [Singh] obtaining financing for the required capital

21

improvements to [the Beach] and other matters," it contained no language restricting Singh's use of the Madison credit to the required improvements. A-480. The amendment also highlighted that Singh still had to make approximately $1.7 million in capital improvements at the Beach by April 2015.[6]

The Beach loan transaction closed on June 18, 2010, at which point Genova executed a related "Default Assignment of Concession Proceeds Agreement" that expressly stated any default by Singh on the loan would "thereby trigger[] [Madison's] *right* to the [termination] payments." A-489 (emphasis added). This language seemingly eliminated the Town's discretion as to sending Singh's termination payment to Madison in the event of default, effectively rendering it a guarantee. As consideration, Singh signed a release of any claims related to the termination of the agreement. A-485. Cornachio billed the Town for reviewing and editing the Beach concession amendment and the related assignment agreement.

---

[6] On June 8, 2010, Venditto also executed an amendment to Singh's Woodlands concession agreement, effectively guaranteeing a potential $2 million loan from an unspecified "designated financing entity." *United States v. Mangano*, No. 16-cr-540, 2022 WL 65775, at *53 n.46 (E.D.N.Y. Jan. 6, 2022). Like the Beach amendment, the Woodlands amendment provided an indirect guarantee to the potential lender, using the same framework that Cornachio devised. Though authorized by the Town, the loan referenced in the Woodlands amendment never closed.

22

### b. *The May 2011 $3.4 Million Woodlands Loan Guarantee*

Nearly a year later, in May 2011, Madison agreed to extend a $3.4 million loan to Singh for his obligations to make improvements at the Woodlands. Mei prepared a concession amendment identifying Madison as Singh's financier. As with the June 2010 line of credit guarantee, the May 2011 loan guarantee involved a related default assignment of termination proceeds that served to effectively secure the loan amount. Because this loan involved more money than the June 2010 line of credit, Madison sought a written opinion letter from outside counsel that the amendment to Singh's licensing agreement with the Town was authorized and enforceable. To satisfy that request, Mei and Singh obtained a letter from Harris Beach, a law firm. Singh paid for the firm's services, although Madison believed that Harris Beach represented the Town. Without fully reading the amendment or related assignment agreement, Genova signed both on May 25, 2011, clearing the way for Singh to obtain the $3.4 million Madison loan that same day. Notably, as a condition to loaning Singh the $3.4 million, Madison required Singh to use approximately $1.25 million to pay off his other outstanding debts—a requirement which meant that he would need even more

funding to complete the outstanding $3.25 million in required capital improvements at the Woodlands.

### c. The November 2011 $7.8 Million Woodlands Loan Guarantee

Knowing that the Madison loans were insufficient to fund his obligations at the Town concessions, Singh "started looking for a lender who w[ould] lend higher and pay Madison Bank off." A-1419. By January 2011, Singh had connected Mei with NDH Capital Corporation ("NDH"), a potential lender, about additional Town loan guarantees. Mei told NDH and Singh that it would be best to rely on the vaguely-worded June 2010 resolution for authorization to make further amendments to Singh's concession agreements. This plan aligned with Mei's general practice of keeping Town Board resolutions "blissfully simple," allowing him to "stick all the good stuff in the agreements." A-1686.

In November 2011, without the Town Board ever voting on a new resolution, Genova authorized an amendment to Singh's Woodlands concession agreement. That agreement provided for a $7.8 million payment from the Town to NDH if Singh defaulted on a related NDH loan agreement for the same amount. The amendment contained language authorizing the payment in the event of Singh's default, whether the Town terminated Singh's concessions with

24

or without cause. Just like the Madison agreements, the NDH agreement accompanied an assignment to NDH of Singh's rights to Town payments, and Singh separately agreed not to sue the Town in connection with any termination of his license to run the Woodlands concession. As with the second Madison agreement, Harris Beach provided NDH with a letter opining that the amendments and assignments were authorized and enforceable. With these NDH proceeds, Singh paid off part of his obligations to Madison, ultimately netting approximately $3 million.

### d. The June 2012 $12.27 Million Beach Loan Guarantee

Genova signed another NDH-related amendment in June 2012, this time to Singh's Beach concession agreement. The amendment and related side assignment guaranteed a $12.27 million loan that NDH had granted Singh earlier that month. Like the November 2011 loan agreement, the June 2012 deal linked NDH's guaranteed termination payments to Singh's total outstanding balance, including late interest, fees, costs, and expenses. These agreements also clearly eliminated the Town's discretion as to whether to terminate Singh's concessions in the event of his defaulting on the loans.

Mei received a $25,000 cash payment from Singh after each NDH loan closed.  Neither NDH loan was kept on file in the Town clerk's office, as was required.  Although Mangano was not involved with, or even aware of, the two NDH loans, these latter loans had the same structure as the Madison loans that Cornachio—under Mangano's urging—helped engineer, and they were purportedly authorized under the same June 2010 Town resolution that Mangano pressured Venditto to pass.[7]

## B. The County Contracts Scheme

The government also presented evidence that Mangano took official action to secure two Nassau County contracts for Singh's businesses.  The first came in 2012, when Singh secured a one-year, $200,000-plus contract for his bakery to provide bread and rolls to the Nassau County Jail.  The second, also in 2012, involved a $240,000 payment to provide food to the Nassau County Emergency

---

[7] When Singh ultimately defaulted on the first NDH loan, the Town refused to pay the guarantee provided for in the concession amendment and related side agreement. We affirmed the dismissal of NDH's insurance company's subsequent lawsuit, determining that the insurer failed plausibly to allege that the relevant NDH loan was approved by the Town Board.  The June 2010 Resolution, we held, could not plausibly have authorized the much-later-in-time November 2011 NDH loan guarantee, and attorneys' opinion letters were mere "legal opinion[s]," not "statement[s] of fact."  *PHL Variable Ins. Co. v. Town of Oyster Bay*, 929 F.3d 79, 83, 93–94 (2d Cir. 2019).  At trial, Singh testified that he defaulted on both NDH loans.

Management Center during Hurricane Sandy. Prior to Mangano's election to County Executive, Singh had never received a Nassau County contract.

### C. The Obstruction of Justice and False Statements

At trial, the government introduced evidence that Mangano and L. Mangano conspired together to obstruct a grand jury investigation into Singh's payments to them by providing false statements to FBI Special Agents assisting in an investigation into L. Mangano's alleged employment with Singh.

In the course of executing a search warrant in August 2014 at one of Singh's businesses, FBI agents obtained information about L. Mangano's paychecks from Water's Edge. Based on this information, on January 13, 2015, FBI Special Agent Laura Spence drove to Water's Edge and asked the manager whether L. Mangano worked there; he responded that she did not. Spence then traveled to the Mangano residence, where L. Mangano "welcomed [Spence and another agent] into the home" and told them about her employment with Singh. A-1067. She stated that she handled invitations for Singh's tastings and soft openings, had input on menus at several Singh-owned restaurants, handled changes for several Singh-owned restaurants, and provided marketing ideas. She also stated that she left Singh's employment around August 2014 because she felt he no longer

27

needed her full-time and because he was having "financial difficulties." *Id.* This conversation was not recorded, in keeping with standard FBI practice regarding voluntary witness statements. As the agents were leaving, they returned to the house and told L. Mangano that lying to a federal agent is a crime and that, if she wanted to change anything she said, "now would be the time do so." A-1069. L. Mangano declined to change any of her statements. Within hours of the discussion, Special Agent Spence typed up the notes from the interview.

After the January 13, 2015 meeting, L. Mangano spoke with her husband and Singh about what she had said to the FBI agents. The Manganos told Singh that, if asked, he should tell the "FBI or anybody else" the same story that L. Mangano had about the work she purportedly did at Water's Edge. A-1243–44. Singh testified that "what [L. Mangano] told the agents that she did . . . was not true" and "not correct." A-1244. The only work she had done for him was in early 2010, when she sent "some e-mail blasts" and "organiz[ed]" a women's luncheon. *Id.* Nevertheless, he agreed to repeat her falsehoods if the FBI or anyone else asked him what L. Mangano did for him, recognizing that the Manganos "wanted to make sure the stories are straight," and that Singh would

28

falsely confirm to the agents "that Linda Mangano had a job and she did what she was telling the agents she did."   *Id.*

On February 6, 2015, Special Agent Spence returned to the Mangano residence and served L. Mangano with a federal grand jury subpoena for her testimony and any documentation she had regarding her work for Singh and his businesses.   Mangano called Singh after L. Mangano received the subpoena and asked Singh to come to his house.   Singh appeared the next day, providing the Manganos with documents related to L. Mangano's no-show job and discussing some of the work that she purportedly did for Singh's businesses—none of which, according to Singh, she had actually done.

On May 20, 2015, L. Mangano appeared, with counsel, at the U.S. Attorney's Office for the Eastern District of New York to proffer information to the government regarding her employment with Singh.   Special Agent Spence took notes as L. Mangano was speaking "to make sure [she was] accurately writing down what [L. Mangano was] saying during the interview."   A-1074. Neither L. Mangano nor her attorney ever asked for the proffer session to be recorded.   At the outset, government officials told L. Mangano that lying to them was a federal crime and that her words could be used against her if they

29

amounted to lies. During the meeting, L. Mangano made the following statements: that she went to Water's Edge restaurant three or four times at the beginning of her employment there; that she stopped working there in March or April of 2014 (rather than July or August of 2014, as she had initially reported during her first interview with the agents); that she designed menus at two Singh-owned restaurants; and that she participated in food tastings (but not that she had helped manage invitations to such tastings, as she had stated during the first interview). She also stated that she had spoken to Singh the day before the interview. At that point, her attorney stopped the proffer session and asked to return two days later. At trial, Singh confirmed that he met with the Manganos on the two days immediately prior to the first proffer session, and that he learned the Manganos were planning to tell the government things that "w[ere] not true" regarding her employment and some of the vacations the Manganos had taken at Singh's expense. A-1246–47.

Two days later, on May 22, 2015, L. Mangano and her attorney returned to continue the proffer session at the U.S. Attorney's Office for the Eastern District of New York. L. Mangano explained that, on May 19, Singh had visited her home for a social visit and that, although Singh knew that the government would

interview her on May 20, he did not have lengthy discussions with her about the proffer session. She repeated that she left Singh's employment in April 2014, this time explaining that she did so because of different job opportunities; one was with a state assemblymember, worth $80,000 per year, which she ultimately turned down.

After the May 22 session concluded, Special Agent Spence prepared a report detailing L. Mangano's statements, which another agent who was present during the meeting confirmed for accuracy. In that report, Special Agent Spence recorded that L. Mangano made the following statements during the May proffer sessions, after having received a subpoena for testimony and documents related to her work with Singh: that she went to Water's Edge three or four times for work purposes when she first started there; that she designed and revised a two-sided menu for Besi, a Singh-owned restaurant; that she spent approximately two days a week in the office at her current job; that she told Singh she was leaving his employment in April 2014; that she could have earned $80,000 per year working for a New York assemblymember instead of Singh but declined to take that offer; and that her employment with Singh was not a no-show job.

Evidence at trial later revealed that these statements were false.    L. Mangano did not go to Water's Edge three or four times for work purposes in 2010; a professional design firm handled the Besi menu; she did not spend two days a week working at her then-current job; she did not leave Singh's employment in April 2014; she did not have an alternative $80,000 per year job offer with a state assemblymember; and her job with Singh was a no-show job. Moreover, some of her earlier statements about when she stopped working for Singh were proven to be false, and she also falsely reported that she had not discussed the proffer session with Singh at length.

## II. Procedural Background

### A. The First Trial

On October 18, 2016, a grand jury in the United States District Court for the Eastern District of New York returned an indictment against Mangano, L. Mangano, and Venditto.    As to Mangano and Venditto, the government charged counts of conspiracy to commit federal programs bribery, federal programs bribery, conspiracy to commit honest services fraud, and honest services fraud, in violation of 18 U.S.C. §§ 371, 666(a)(1)(B), 1343, 1346, and 1349.    These charges centered on bribes that Singh allegedly paid Mangano and Venditto in return for

their "performing official actions, on an as needed basis, as opportunities arose" with regard to the Town loans scheme and the County contracts scheme. A-49. The government separately charged Mangano with extortion under color of official right, a violation of 18 U.S.C. § 1951, in connection with the Nassau County contracts.

As to Mangano and L. Mangano, the indictment charged counts of conspiracy to obstruct justice in relation to their meetings with Singh to "fabricate[] stories in an attempt to explain [L. Mangano's] employment by [Singh]." A-52. L. Mangano and Venditto were each separately charged with obstruction of justice and making false statements. Later, the grand jury added securities and wire fraud charges against Venditto via a superseding indictment.

Before trial, Mangano filed a motion to dismiss the indictment, claiming, *inter alia*, that he could not be liable for federal programs bribery or honest services fraud in connection with the Town loan guarantees scheme because he was not a Town agent and did not owe the Town a fiduciary duty. Mangano also asserted that the initial June 2010 loan guarantee occurred outside the relevant statute of limitations for honest services fraud and federal programs bribery. L. Mangano filed her own motion to dismiss, joining her co-defendant's

motion and separately arguing, *inter alia*, that the obstruction of justice and false statements counts against her failed to provide specific facts about her alleged crimes. By order dated February 9, 2018, the Court denied these motions.

Trial commenced on March 14, 2018. "Over the course of ten weeks of testimony, the government called approximately 60 witnesses. Singh, pursuant to a cooperation agreement, testified on the stand for 12 days." *Mangano*, 2022 WL 65775, at *17. After six days of deliberation, the jury acquitted Venditto of all charges. But after several more days of deliberation, the jury could not reach a verdict as to the Manganos. The district court thereafter declared a mistrial as to the charges they faced.

## B. The Second Trial

On August 8, 2018, the grand jury issued a Second Superseding Indictment that substantially mirrored the first but did not name Venditto as a defendant. Once again, Mangano was charged with conspiracies to commit and violations of federal programs bribery and honest services fraud as to the Town loan guarantees scheme and the County contracts scheme. He was also charged with extortion as to the County contracts scheme only.

The indictment alleged that "EDWARD MANGANO, together with others, engaged in a scheme to solicit and receive bribes and kickbacks from Singh in exchange for EDWARD MANGANO performing official actions, or causing the performance of official actions, on an as-needed basis, as opportunities arose, in connection with Singh's businesses," including, as to the Town loan guarantees scheme, "the [Town's] guarantee of certain loans that certain business entities of Singh's received from Madison National Bank (the 'Bank') and NDH Capital, a private financing company (the 'Lender'), in connection with Singh's status as a [Town] concessionaire." A-149. In the federal programs bribery-related counts, the indictment specified that Mangano, being an agent of Nassau County, "did knowingly, intentionally and corruptly solicit and demand for the benefit of EDWARD MANGANO . . . one or more things of value, from a person, to wit: Harendra Singh, intending to be influenced and rewarded in connection with business and one or more transactions and series of transactions of Nassau County and the [Town]," including the County contracts and the Town loan guarantees. A-153–54, A-155.

The indictment also charged Mangano and L. Mangano with conspiracy to obstruct justice and L. Mangano with obstruction of justice and false statements.

35

It alleged that the Manganos repeatedly met with Singh and "fabricated stories in an attempt to explain [L. Mangano's] employment by Singh and Singh's payments of gifts and vacation expenses for [them]." A-152. Specifically, the indictment alleged that L. Mangano's false statements included claims that she "us[ed] Excel spreadsheets" to "handle[] Singh's invite lists for tastings and gatherings," "handled the menu changes and new color schemes for Singh's restaurants," "provided input regarding the food on the menu at [three Singh-owned restaurants]," "met with Singh three or four times a week at her home to discuss her design ideas for the menus," and "voluntarily left Singh's employment because she believed Singh was having financial difficulties and that he did not need her full time services any longer." A-160.

Prior to the second trial, Mangano moved to dismiss the charges by raising two new arguments based on the outcome of the first trial and renewing, without any explanation, the arguments that he had raised in his prior motion to dismiss. He also argued that the obstruction of justice conspiracy allegations were facially insufficient. In a subsequent filing, Mangano moved to dismiss the charges based on alleged prosecutorial misconduct. By letter motion, L. Mangano joined Mangano's argument regarding the obstruction of justice conspiracy and the

36

alleged prosecutorial misconduct. The Court denied these motions on January 17, 2019, rejecting the arguments Mangano raised before the first trial "for the same reasons stated previously." *Mangano*, 2022 WL 65775, at *18. The Court rejected Mangano's prosecutorial misconduct argument as well. *See United States v. Mangano*, No. 16-cr-540, 2022 WL 59697, at *1 (E.D.N.Y. Jan. 6, 2022).

Beginning on January 22, 2019, the government tried the Manganos a second time. "The jury heard five weeks of testimony from approximately 40 witnesses. Singh testified for five days, including a cross-examination that lasted three-and-a-half days. After defense counsel cross-examined Singh, the government chose not to ask questions on redirect examination." *Mangano*, 2022 WL 65775, at *18.

On March 8, 2019, the jury convicted Mangano for his involvement in the Town loan guarantee scheme, finding him guilty of conspiracy to commit federal programs bribery and honest services fraud, as well as the related substantive offenses. However, on a special verdict form, the jury made clear that it did not find Mangano guilty of any crime involving the County contracts scheme. As to the conspiracy to obstruct justice, the jury found Mangano and L. Mangano guilty.

The jury also found L. Mangano guilty of obstruction of justice and making false statements.

Nearly a year passed before Mangano filed any post-trial motions. Then, on January 28, 2020, Mangano moved for reconsideration, a new trial, and acquittal as to the bribery charges based on *United States v. Silver ("Silver II")*, 948 F.3d 538 (2d Cir. 2020), which had been decided just one week earlier. Mangano also filed a Rule 33 motion for a new trial based on testimony Singh provided during a post-trial deposition in an unrelated civil case, which Mangano alleged proved that Singh perjured himself during trial. The district court subsequently held a hearing on April 20, 2021, where Singh testified about his post-trial deposition.[8] The district court ultimately denied these motions. *Mangano*, 2022 WL 65775, at *1.

On April 19, 2022, the district court entered judgment sentencing Mangano to five years of imprisonment on Count 1 (conspiracy to commit federal programs bribery); 10 years of imprisonment on Count 2 (federal programs bribery); and 12 years of imprisonment on Counts 3, 4, and 7 (conspiracy to commit honest

---

[8] The facts relevant to this claim are discussed at more length in the separate summary order, filed concurrently with this opinion, which affirms the district court decision to deny Mangano's motion for a new trial.

services fraud, honest services fraud, and conspiracy to commit obstruction of justice), all to run concurrently and to be followed by three years of supervised release. The district court also sentenced L. Mangano to 15 months of imprisonment as to her convictions on Counts 7, 8, 10, and 11 (conspiracy to commit obstruction of justice, obstruction of justice, and two counts of making false statements), to be followed by two years of supervised release. Both defendants timely appealed.

## DISCUSSION

On appeal, Mangano challenges his convictions for federal programs bribery, honest services fraud, conspiracy, and obstruction of justice on multiple grounds, some of which we address in a related summary order. As to the arguments discussed herein, Mangano contends that the evidence was insufficient to convict him on the federal programs bribery-related charges, Counts One and Two, and that the jury was improperly instructed. He also challenges the instructions and sufficiency of the evidence as to the honest services fraud-related charges and, joined by L. Mangano, the obstruction of justice-related charges.

### I. Standard of Review

We review challenges to a district court's jury instructions *de novo*. *See*

*United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015).  "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law."  *Id.* (quoting *United States v. Naiman*, 211 F.3d 40, 51 (2d Cir. 2000)).

As for challenges to the sufficiency of the evidence, we also apply *de novo* review, recognizing that a defendant raising such a challenge "bears a heavy burden because a reviewing court must consider the evidence 'in the light most favorable to the prosecution' and uphold the conviction if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Aguilar*, 585 F.3d 652, 656 (2d Cir. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

## II. Federal Programs Bribery

Mangano argues that the evidence was insufficient to convict him on charges of committing federal programs bribery and of conspiracy to commit federal programs bribery, *see* A-153–55 (detailing Counts One and Two of the operative indictment).  He contends, in particular, that the government failed to prove that he was an agent of the Town of Oyster Bay, precluding his conviction as a principal on Count Two, which charges federal programs bribery.  He

40

further contends that the evidence was insufficient to show that he aided and abetted others in connection with the scheme alleged in Count Two, or that he was properly convicted for conspiring to commit federal programs bribery, as charged in Count One. For the following reasons, we agree.[9]

## A. Principal Liability

Mangano first asserts that because the evidence at trial did not establish that he was an agent of the Town, he cannot be held liable as a principal for committing federal programs bribery in connection with the Town loan guarantees. As relevant here, Section 666 prohibits an "agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof" from "corruptly solicit[ing] or demand[ing] for the benefit of any person, or accept[ing] or agree[ing] to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more." *See* 18 U.S.C. § 666(a).

---

[9] Because we agree with Mangano's sufficiency challenge, we need not address his arguments regarding the jury instructions on the federal programs bribery and related conspiracy counts.

41

"To determine whether a target of corrupt 'influence or reward' is an 'agent' for purposes of [§ 666 liability], we 'necessarily begin with the plain meaning of the law's text and, absent ambiguity, will end there.'" *United States v. Dawkins*, 999 F.3d 767, 781 (2d Cir. 2021) (internal brackets and ellipsis omitted) (quoting *United States v. Ng Lap Seng*, 934 F.3d 110, 122 (2d Cir. 2019)). The text of Section 666(a)(1)(B) unambiguously applies only to those "agent[s]" of a qualifying local government who solicit or accept a bribe "intending to be influenced . . . in connection with any business, transaction, or series of transactions of *such* . . . government." 18 U.S.C. § 666(a)(1)(B) (emphasis added). In other words, to be liable for federal programs bribery, an agent's principal must be the "organization . . . State, local, or Indian tribal government, or any agency thereof" that has its business corrupted by the bribe.

Because the jury convicted Mangano of federal programs bribery only in connection with the Town loan guarantees scheme, and not in connection with the County-related contracts scheme, Mangano's liability as a principal under Section 666 thus hinges on whether the proof at trial established that Mangano was an agent of the Town of Oyster Bay—the local government with regard to which he was convicted of accepting a bribe, "intending to be influenced . . . in

42

connection with" its business. *Id.* The government at trial, however, while arguing that Mangano was liable as a principal, conceded that Mangano was *not* an agent of the Town.[10] *See* A-2326 (prosecution stating they were "not arguing that Ed Mangano is the agent [of the Town]"). This Court "typically accept[s] or assume[s] the accuracy of [a] concession without question." *D.S. ex rel. M.S. v. Trumbull Bd. of Educ.*, 975 F.3d 152, 162 (2d Cir. 2020). And the government presents no reason for departing from that typical practice here.

Moreover, when a party concedes a point before a lower court, it generally "waive[s] . . . the issue" and cannot thereafter raise an argument before this Court that is contrary to the concession. *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72–73 (2013). Yet, on appeal, the government contends that the indictment, by alleging that Mangano was an agent of Nassau County, "necessarily included" within the scope of his agency relationship all subdivisions and governments within the County, including the Town of Oyster Bay. But this argument flatly contradicts the government's repeated concession below that Mangano was *not*

---

[10] This concession was consistent with both Counts One and Two, the federal programs counts, which identify Mangano as "an agent of a local government, to wit: Nassau County," A-155, and with the district court's instruction to the jury, without objection, that "[i]t is not alleged that Edward Mangano is an agent of the [Town]." A-216.

43

an agent of the Town. *See, e.g.*, *Mangano*, 16-cr-540, Dkt. No. 485 at 34 ("Mangano

is correct that he was not an agent of [the Town]"); A-2105 (government agreeing

during the charge conference that it was "not alleged that Edward Mangano [was]

an agent of the [Town] because it's not in the indictment" and that "[t]here's no

theory under which the jury should be allowed to convict under the notion that

Edward Mangano is an agent of the [Town]"). We therefore conclude that the

government has waived the argument that Mangano was properly held liable as

a principal on the theory that he was a Town agent by virtue of being an agent of

the County.[11]

Even if we were to consider the government's waived argument, moreover,

on the record here, it would fail. Section 666 defines an "agent" as "a person

---

[11] We likewise reject the government's suggestion that Mangano was a Town agent because Singh reasonably believed that Mangano could act on its behalf. The government provides no persuasive authority for the proposition that a briber's reasonable belief in a government official's agency relationship establishes that such an agency relationship exists for the purposes of Section 666. Its citation to *United States v. Buenrostro*, 781 F.3d 864, 870 (7th Cir. 2015), is inapt. That case concerned an undercover government sting operation in which two individuals conspired to bribe a fictional government official working for Los Angeles County. *Id.* at 866. The Seventh Circuit determined that evidence that "the conspirators reasonably believed [the undercover agent's] claims that the [fictional] official could act on behalf of Los Angeles County" was sufficient to support conviction for *conspiracy* to violate Section 666. *Id.* at 870. *Buenrostro* thus does not speak to what is required to prove the elements of the substantive offense.

authorized to act on behalf of another person or a government," such as an "employee," "partner, director, officer, manager, [or] representative." 18 U.S.C. § 666(d)(1). The government presented no evidence at trial that Mangano had authority to act on behalf of the Town, nor that he was an employee or representative of the Town. We thus necessarily conclude that the government produced insufficient evidence for "any rational trier of fact [to] have found [an] essential element[ ] of the crime beyond a reasonable doubt," *United States v. Silver ("Silver I")*, 864 F.3d 102, 113 (2d Cir. 2017)—namely, that Mangano was an agent of the Town, as required for liability for federal programs bribery as charged in Count Two.

The government finally contends that, even assuming Mangano was *not* a Town agent, he was properly held liable as a principal on Count Two because evidence showed that he agreed to hire certain individuals at the County—for which he *was* an agent—in return for Venditto's help in authorizing the Town loan guarantees. Specifically, at the April 28, 2010 meeting where Mangano pressured Venditto and other Town officials to back Singh's loans, Venditto asked Mangano to hire some of Venditto's associates into County government and to promote others already employed there. The district court endorsed this theory

of principal liability in ruling on post-trial motions, concluding that Mangano intended to be influenced in connection with "Nassau County business, including the hiring and promotion of multiple employees" because "Singh was bribing Mangano to use any levers of his authority that were necessary to pressure Venditto to back the [Town] loan guarantees, Singh's ultimate goal." *United States v. Mangano*, No. 16-cr-540, 2022 WL 2872670, at *6 (E.D.N.Y. July 20, 2022).

We disagree. This theory falters at the threshold, as it is premised on a quid pro quo arrangement between Mangano (as an agent of the County) and *Venditto* about *County* business, whereas the indictment, trial proof, and jury verdict address Mangano's role in a quid pro quo arrangement with *Singh* about *Town* business. *See* A-155 (indictment charging Mangano, "being an agent of . . . Nassau County" with accepting bribes from "a person, to wit: Harendra Singh" "for the benefit of EDWARD MANGANO," with no mention of Venditto), A-250 (jury verdict sheet finding the federal program bribery charged in Count Two to be based on the alleged Town loan guarantees scheme but not on the alleged County contracts scheme). The government's theory of the case was never that Mangano committed federal programs bribery because Venditto effectively bribed him to hire and promote certain cronies at the County level in

46

return for Venditto's authorization of the Town loan guarantees. Nor was there proof at trial to suggest that Mangano accepted bribes from Singh intending to be influenced in Nassau County hiring practices. Rather, the indictment and the evidence at trial concerned Mangano's accepting Singh's bribes for Mangano's own benefit in return for influencing Town activity. As a result, considering the trial record in light of the language of the operative indictment and the jury's identification of the Town loan guarantees scheme as the relevant quid pro quo, we conclude that the evidence at trial was insufficient to establish Mangano's liability as a principal under Section 666.

## B. Aiding and Abetting Liability

The government next argues that Mangano aided and abetted federal programs bribery in violation of 18 U.S.C. §§ 2, 666. *See* A-155 (Count Two alleging that Mangano "together with others" committed federal programs bribery). "Under 18 U.S.C. § 2, a defendant may be convicted of aiding and abetting a given crime where the government proves that the underlying crime was committed by a person other than the defendant, that the defendant knew of the crime, and that the defendant acted with the intent to contribute to the success of the underlying crime." *United States v. Willis*, 14 F.4th 170, 183 (2d Cir. 2021)

(quoting *United States v. Hamilton*, 334 F.3d 170, 180 (2d Cir. 2003)). But "the *actus reus* element of federal accomplice liability is not so capacious as to encompass any act taken in relation to some identified criminal activity." *United States v. Delgado*, 972 F.3d 63, 75 (2d Cir. 2020). Rather, such liability encompasses only acts by an aider and abettor that constitute "contribut[ions] to the success of 'the specific underlying crime' for which the defendant is charged with aiding and abetting." *Id.* (quoting *United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996)).

As discussed above, the indictment charged Mangano with aiding and abetting the specific underlying crime of federal programs bribery "for the benefit of EDWARD MANGANO." *See* A-155. The jury convicted Mangano only in connection with Town business, so for Mangano to be liable for aiding and abetting the specific Section 666 violation alleged in the indictment, there must be sufficient evidence for a reasonable jury to have concluded beyond a reasonable doubt that Mangano aided and abetted Town agents who agreed to accept things of value for his benefit in exchange for their influence on Town business. *See id.* The record does not support such a conclusion.

The district court determined that there was sufficient evidence to hold Mangano liable on an aiding and abetting theory because "Singh was bribing Venditto, Genova, and Mei," all Town officials, and "[a] reasonable juror could infer that Mangano was aware of that fact." *Mangano*, 2022 WL 2872670, at *6. Although the government presented ample evidence that Singh bribed Town officials, however, and even assuming *arguendo* that it would be reasonable to infer Mangano's knowledge of those bribes, these facts do not support aiding and abetting liability here. The bribes to Town officials, so far as the evidence shows, were to benefit them—not Mangano, as the indictment alleges. "[A] defendant who has been indicted for aiding and abetting a particular crime cannot be convicted based on evidence that he aided and abetted a second, separate crime, even if related to the first." *Delgado*, 972 F.3d at 75. The indictment specifically alleges that Mangano aided and abetted a bribery scheme "for the benefit of EDWARD MANGANO," A-155, not Town officials, so evidence of the latter is insufficient to support conviction of the former. And the government produced no evidence that Singh's bribes to Venditto, Genova, and Mei were for Mangano's benefit — nor could it, since those bribes were plainly for the benefit of the Town officials who pocketed them. We therefore conclude that the evidence was

49

insufficient to support the government's aiding and abetting theory and reverse the conviction as to Count Two of the indictment, remanding to the district court for further proceedings consistent with this holding.

## C. Conspiracy Liability

Finally, Count One of the indictment charges a conspiracy to commit federal programs bribery, and alleges that Mangano, together with others, agreed corruptly to solicit and accept bribes from Singh "for the benefit of EDWARD MANGANO" with the intent to be influenced in connection with County and Town business. A-153–55. Conspiracy liability "require[s] proof of: (1) an agreement between at least two people to commit an unlawful act, and (2) the defendant's knowing engagement in the conspiracy with the specific intent that the object of the conspiracy be committed." *United States v. Zemlyansky*, 908 F.3d 1, 10 (2d Cir. 2018). The relevant "conspiracy" must be "the scheme alleged in the indictment." *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) (quoting *United States v. Hassan*, 578 F.3d 108, 123 (2d Cir. 2008)). Here, the jury found Mangano guilty of conspiracy to commit federal programs bribery only in relation to the Town loan guarantees scheme.

The government devotes scant attention on appeal to the sufficiency of the evidence as to Count One.[12]    We conclude, finally, that the evidence at trial was also insufficient to hold Mangano liable for the conspiracy to commit federal programs bribery alleged in the indictment and identified by the jury.    Just as the substantive bribery charge in Count Two specifies that the bribes were for Mangano's benefit, Count One's charge of conspiracy to commit federal program bribery turns on "EDWARD MANGANO, being an agent of a local government, to wit: Nassau County, together with others . . . knowingly and willfully conspir[ing] to corruptly solicit and demand for the benefit of EDWARD MANGANO . . . one or more things of value, from a person, to wit: Harendra Singh, intending to be influenced and rewarded in connection with business . . . of . . . the [Town] . . ."    A-153–54.    But the government presented no evidence at trial that anyone other than Mangano and Singh, neither of whom were agents of the Town, were part of an agreement to influence the Town's business for the

---

[12] The government reframes Mangano's argument — that conspiracy liability is insufficiently supported by the evidence — as a constructive amendment claim.    But in so doing, "the Government argues against something that Mangano did not and does not assert (that the indictment was constructively amended)."    Mangano Reply Br. 50.    We thus need not address the government's briefing on this point.

51

benefit of Mangano.[13]  The evidence was thus insufficient to conclude that the arrangement between Mangano and Singh, as it involved the Town's business, included as an objective the violation of Section 666(a)(1)(B).  Because there was insufficient evidence to convict Mangano of "knowing[ly] engag[ing] in the conspiracy with the specific intent that the object of the conspiracy be committed," *Zemlyansky*, 908 F.3d at 10, we reverse the conviction on Count One of the indictment and remand to the district court for further proceedings consistent with this opinion and the related summary order.

## III. Honest Services Fraud

Mangano next contends that his honest services fraud convictions should be reversed because of improper jury instructions and insufficient evidence as to several elements of the offense.  First, Mangano claims that the honest services fraud jury instructions improperly allowed the jury to convict him without finding the required fiduciary relationship; he also alleges that there was

---

[13] To the contrary, the government elicited trial testimony that no one other than Singh and Mangano knew of the scheme to bribe Mangano for his support in securing the Town loans.  *See, e.g.*, A-1182–84, 1508–09 (Singh testifying that he did not tell Mei he was bribing Mangano and that if he was bribing someone, only he and that person knew); *see also* A-2160 (government admitting in summation that Singh "never admitted to anyone that he was bribing Ed Mangano").

52

insufficient evidence that he violated a fiduciary duty. Second, Mangano argues that the jury instructions failed to convey the timing and specificity requirements necessary to finding a quid pro quo, as established by *McDonnell v. United States*, 579 U.S. 550, 574 (2016), and discussed in *Silver II*, 948 F.3d at 568, and that, in any event, the evidence as to those elements was insufficient to convict him. Third, Mangano argues that the jury instructions improperly defined the term "official act" as interpreted in *McDonnell*. *See* 579 U.S. at 574. Finally, Mangano contends that the district court erred by not providing an instruction on the statute of limitations applicable to the honest services fraud charges and that the evidence failed to demonstrate that the statute of limitations was satisfied.

We disagree on all fronts and address each challenge below.

## A. Legal Background

Honest services fraud is a type of mail or wire fraud in which the "scheme or artifice to defraud" includes a scheme "to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Before Congress passed the honest services fraud statute in 1988, courts had relied on mail and wire fraud statutes to address instances where "public employees had accepted a bribe or kickback in exchange for dishonest conduct that did not necessarily cause their employers to

53

suffer a financial loss." *Percoco v. United States*, 598 U.S. 319, 326 (2023). In 1987, the Supreme Court invalidated that theory of mail or wire fraud after finding those statutes were limited "to the protection of property rights." *McNally v. United States*, 483 U.S. 350, 360 (1987). When Congress responded one year later by passing Section 1346, it "dispelled any doubt" about whether the mail and wire fraud statutes "protect a right to 'honest services.'" *Percoco*, 598 U.S. at 334 (Gorsuch, *J.*, concurring).

More than 20 years after its passage, the honest services fraud statute withstood a constitutional void-for-vagueness challenge in *Skilling v. United States*, 561 U.S. 358 (2010). "[A]cknowledg[ing] that Skilling's vagueness challenge ha[d] force," the Supreme Court applied a limiting construction that narrowed the statute's reach to cover only "offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes." *Id.* at 405, 407; *see also id.* at 409. As a result of this construction, "a violation of a fiduciary duty is an element of honest services fraud." *United States v. Napout*, 963 F.3d 163, 181 (2d Cir. 2016) (internal quotation marks omitted).

So, too, is a quid pro quo. Although there is "no uniform definition" for the word "bribe" in the federal code, "bribery is generally understood to mean

the corrupt payment or offering of something of value to a person in a position of trust with the intent to influence his judgment or actions." *Ng Lap Seng*, 934 F.3d at 131 (citing *Perrin v. United States*, 444 U.S. 37, 43–46 (1979) (tracing the ordinary meaning of the term "bribery")). "[T]his quid pro quo element—'a specific intent [corruptly] to give . . . something of value *in exchange*' for action or decision[—] distinguishes bribery.'" *Id.* at 132 (citing *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404–05 (1999)); *see also* 18 U.S.C. § 201(b)(1)(A) (explaining that "[b]ribery of public officials" occurs when a person "corruptly gives . . . anything of value to any public official" with intent "to influence any official act").[14] Our circuit has recognized that a quid pro quo can "involv[e] payments at regular intervals in exchange for specific official acts as the opportunities to commit those acts arise." *United States v. Ganim*, 510 F.3d 134, 147 (2d Cir. 2007).

In *McDonnell*, the Supreme Court clarified that an official act is "a decision or action on a 'question, matter, cause, suit, proceeding or controversy.'" 579 U.S. at 574. The court further explained that the "question [or] matter" on which

---

[14] In this case, the parties agreed to define honest services fraud consistent with the federal bribery statute, § 201. A-219–21.

the act is taken must "involve a formal exercise of governmental power" on "something specific and focused that is 'pending' or 'may by law be brought'" before a public official." *Id.* "To qualify as an 'official act,' the public official must make a decision or take an action on that [specific and focused question or matter], or agree to do so." *Id.* "That decision or action may include using his official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *Id.*

Combined, these common law and statutory elements mean that honest services fraud convictions require evidence demonstrating that: (1) the defendant violated a fiduciary duty to another party in agreeing to a quid pro quo; (2) the defendant understood, at the time of the quid pro quo, on which specific question or matter the briber expected him to act; and (3) the action that the defendant agreed to take in exchange for the bribe was an official act.

## B. Fiduciary Duty

"In New York, a fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *United States v. Halloran*, 821 F.3d

321, 337 (2d Cir. 2016) (quoting *Oddo Asset Mgmt. v. Barclays Bank PLC*, 19 N.Y.3d 584, 591–93 (2012)). Mangano contends that he owed no duty to the Town because he was never elected to any Town office. He also argues that, although he owed a fiduciary duty to the County, his actions with respect to the Town loan guarantees scheme could not have violated that duty because they amounted to lobbying, a First Amendment-protected activity. Accordingly, he claims that the evidence of a fiduciary duty violation was insufficient and, moreover, that the jury instructions failed to inform the jury that it could only convict Mangano if it found that he had a duty to the Town and breached that duty through his Town loan-related actions. For the following reasons, we disagree.

In suggesting that an official owes a fiduciary duty only to the governmental entity he represents, Mangano's arguments miss the mark. When identifying the "core" of honest services, the *Skilling* court relied on *Shushan v. United States*, a case it credited with "stimulat[ing] the development of an 'honest services' doctrine. 561 U.S. at 400, 404. *Shushan* affirmed the conviction of a local utility board member who accepted a bribe to influence an official from a distinct governmental entity—the state governor. *Shushan v. United States*, 117 F.2d 110, 114 (5th Cir. 1941) *cert. denied*, 313 U.S. 574, *abrogated on other grounds by*

*United States v. Cruz*, 478 F.2d 408 (5th Cir. 1973)). The *Skilling* Court highlighted *Shushan*'s conclusion that engaging in this kind of scheme "'would not only be a plan to commit the crime of bribery, but would also be a scheme to defraud the public.'" *Skilling*, 561 U.S. at 400 (quoting *Shushan*, 117 F.2d at 115). The *Skilling* Court thus clarified that, within the honest services doctrine, an official's fiduciary duty extends not merely to the entity he works for but also, and perhaps more fundamentally, to the people whom that entity serves. The Supreme Court recently reaffirmed this principle in *Percoco v. United States*, noting that a fiduciary duty to the government necessarily entails a duty "to the public it serves." 598 U.S. at 329–30.[15]

Several sister circuits have agreed with this understanding that, in the honest services fraud context, a public official's fiduciary duty runs to the people he serves, not merely his governmental employer. *See United States v. Lopez-Lukis*, 102 F.3d 1164, 1169 (11th Cir. 1997) (holding that a government official's "*constituents* have a right to have their best interests form the basis of" his

---

[15] Mangano's reliance on *Percoco* to assert that he owed no fiduciary duty under § 1346 is misplaced. Unlike the defendant in *Percoco*, who was charged for conduct that occurred when he held *no* government position, Mangano was no mere "private citizen," a fact that Town witnesses repeatedly emphasized during trial. 598 U.S. at 324–25.

decisions on an official endeavor (emphasis added)); *United States v. Antico*, 275 F.3d 245, 263 n.19 (3rd Cir. 2001) (construing a city official's fiduciary duty as one which runs "to the *citizens* of Philadelphia" (emphasis added)), *abrogated on other grounds by Skilling*, 561 U.S. 538; *United States v. Sorich*, 523 F.3d 702, 707 (7th Cir. 2008) (describing the most common type of honest services fraud as one in which "the *citizenry* is defrauded of its right to the honest services of a public servant" (emphasis added)); *United States v. Renzi*, 769 F.3d 731, 744 (9th Cir. 2014) (affirming the conviction of a former congressman who "deprived his *constituents* of the honest services of their elected representative" (emphasis added)); *United States v. Sawyer*, 239 F.3d 31, 39 (1st Cir. 2001) (holding that "a public official acts as trustee *for the citizens* and the State . . . and thus owes the normal fiduciary duties of a trustee . . . to them" (internal quotation marks omitted, emphasis added)). We join these circuits in what should be an unremarkable holding: public officials owe a fiduciary duty of honest services to the people they serve.

Notably, our interpretation of the fiduciary duty element in honest services fraud differs sharply from our earlier analysis of the agency element in federal programs bribery. This distinction flows from the fact that the federal programs bribery statute contains language specifically linking the bribed agent to the local

59

government that he represents, whereas the honest services fraud statute contains no such language. Thus, while a government official may only be liable for federal programs bribery when he agrees to take action in connection with the federally-funded governmental entity that he represents, that same official may still be liable for honest services fraud for actions in connection with distinct governmental entities so long as those actions deprived his constituents of their right to his honest services.

Applying these principles to the case at hand, the district court did not err in instructing the jury that Mangano "owed the public a duty of honest services by virtue of his official positions" and that "the Government must prove that the goal of the scheme was to deprive Nassau County and/or the [Town] and their citizens of the intangible right to the honest services of the defendant." A-2375. To the contrary, this instruction squarely captures the fact that a public official owes his duty of honest services to the public, *i.e.*, his "electorate." *See United States v. Langford*, 647 F.3d 1309, 1321 (11th Cir. 2011).

Moreover, the evidence sufficiently demonstrated that Mangano violated the fiduciary duty he owed, as Nassau County Executive, to the Nassau County citizens who lived within the Town. Those County residents had a right to have

60

their best interest form the basis of their County Executive's decisions.   *See Lopez-Lukis*, 102 F.3d at 1169.   That right was violated by Mangano's decision to place his own interest in receiving L. Mangano's $100,000 per year salary over their interest in not having their taxpayer dollars employed to illegally guarantee millions of dollars in no-strings-attached loans. [16]   In leveraging his County Executive position to pressure the Town to guarantee the loans, Mangano never held himself out as a lobbyist, and Singh never suggested that he only bribed Mangano for his influence in an unofficial capacity.   To the contrary, Singh testified that he only began to bribe Mangano after Mangano was elected to County office.   And when Mangano organized a meeting for the Town to devise a way of guaranteeing Singh's loans, he listed it on his official County calendar and agreed to provide favorable treatment to certain people in County government.   In all of this, he exercised the "tremendous political clout" he enjoyed over Town officials by virtue of his status as County Executive.   A-1754.

---

[16] *Cf. Shushan*, 117 F.2d at 115 ("A scheme to get a public contract on more favorable terms than would likely be got otherwise by bribing a public official would not only be a plan to commit the crime of bribery, but would also be a scheme to defraud the public.   The fact that the official who is bribed . . . could not award the contract by himself does not change the character of the scheme where he is expected to have influence enough to secure the end in view.").

These facts distinguish him from a lobbyist, and we therefore reject Mangano's challenges as to the fiduciary duty element of his honest services fraud convictions.

## C. Timing and Specificity of the Quid Pro Quo

Mangano separately argues that the jury instructions failed to convey the timing and specificity requirements of an as-opportunities-arise quid pro quo, as explained in *Silver II*. *See* 948 F.3d at 558. In that case, this court found jury instructions erroneous under *McDonnell*, 579 U.S. at 574, because they did not inform the jury that "the Government must prove that, *at the time the bribe was accepted*, Silver promised to take official action on a *specific and focused question or matter* as the opportunities to take such action arose." *Silver II*, 948 F.3d at 568–69 (first emphasis added). This error was fatal to Silver's conviction as to a bribery scheme in which the relevant quid pro quo occurred beyond the statute of limitations, but it was harmless as to his conviction on a different scheme in which it was "clear beyond a reasonable doubt that a rational jury would have found that Silver accepted [bribes] with the belief that he was expected to influence *a particular matter*." *Id.* at 570, 577. We clarified that convicting a public official under the as-opportunities-arise theory of honest services fraud

62

(also known as the "stream-of-benefits" theory) requires showing that the official "promise[d] to take official action *on a particular question or matter* as the opportunity to influence that same question or matter arises." *Id.* at 553; *see also Ganim*, 510 F.3d at 144 ("[I]t is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence—i.e., on behalf of the payor—as specific opportunities arise.").

When the district court denied Mangano's post-trial motions on this issue, it acknowledged that its instructions—which preceded *Silver II*—"did not include the precise language set out in *Silver II*" concerning the timing and specificity of a quid pro quo. *Mangano*, 2022 WL 65775, at *32. But it determined that Mangano had waived or forfeited his challenge by "explicitly endors[ing]" the relevant language in the instructions. *Id.* at *26 & n.17 (highlighting that Mangano proposed instructing the jury that "[i]t is sufficient if the government proves that the defendant you are considering accepted a thing of value in exchange for the promise or performance of official acts by the defendant on an 'as needed' basis when the opportunity presented itself"). The district court contrasted Mangano's explicit endorsement with the procedural actions taken by the defendant in *Silver II*, who not only argued, pre-trial, that *McDonnell*

63

overruled the as-opportunities-arise theory, but also raised that argument in his proposed instructions and at the charging conference. *Id.* at *29. Unlike Silver, the district court concluded, Mangano "intentionally" did not pursue the "particular course of action" of objecting to the as-opportunities arise jury instruction. *See id.* at *26 (citations and internal marks omitted) (quoting *United States v. Williams*, 930 F.3d 44, 64 (2d Cir. 2019)). Such a waiver, the district court recognized, "extinguishes the claim altogether." *Id.*

On appeal, Mangano contends that he did not waive or even forfeit his argument because it was foreclosed prior to the first trial when the district court refused to dismiss the honest services fraud charges against him. But as the district court recognized, "the only *McDonnell*-based challenge raised" pretrial "came in Venditto's reply brief," where he challenged the as-opportunities-arise theory as applied to his role in the County contracts scheme. *Id.* at *27. Mangano joined Venditto's motion, but did not allege that this argument applied to *his* alleged conduct. The government ultimately mooted Venditto's argument, and after his acquittal, the district court noted that "the issues raised by Venditto concerning his potential liability for the Nassau County Contracts scheme were no longer even at issue in the second trial." *Id.* at *28. Thus,

64

although Mangano renewed this motion in the second trial, he "never raised in a pretrial motion a *McDonnell*-based challenge to 'as opportunities arise' theory as it applied specifically to his alleged conduct." *Id.*

In arguing that it would have been futile to raise an already-rejected legal argument, Mangano fails to grapple with the fact that the district court rejected the argument *only* as to the theory's application to Venditto's charges on the County contracts scheme. It never had the opportunity to consider the theory's application to Mangano's charges on the Town loan guarantees scheme. This situation is thus distinguishable from our decision in *United States v. Vebeliunas*, 76 F.3d 1283, 1292 (2d Cir. 1996), where we found that a defendant had not waived an argument that "he had argued unavailingly to the district court in a pretrial motion." Here, because Mangano never argued to the district court that the as-opportunities-arise instructions on the honest services fraud counts *as they applied to his involvement in the Town loan guarantees scheme* were erroneous, we agree with the district court that his renewed motion of Venditto's argument did not preserve his present challenge for review, particularly given his explicit endorsement of the instructions he now challenges.

65

Mangano contends that, even if he failed to preserve the timing and specificity argument, the fact that this court decided *Silver II* after his trial forecloses a finding of waiver. It is true that the law "demands conscientiousness, not clairvoyance," *see Hawknet, Ltd. v. Overseas Shipping Agencies*, 590 F.3d 87, 92 (2d Cir. 2009), and that we have exhibited more leniency when a party was "confronted with a legal landscape whose contours are 'in a state of evolving definition and uncertainty,'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 120 (1988) (quoting *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 256 (1981)). But even if we were to consider his argument forfeited rather than waived, we would not find plain error in the district court's instructions.

Under the plain error standard that applies to forfeited arguments, "an appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Calderon*, 944 F.3d 72, 91 (2d Cir. 2019) (quoting *United States v. Marcus*, 560 U.S.

66

258, 262 (2010)). An error affects the substantial rights of the appellant where there is a "reasonable probability that the error affected the outcome of the trial." *Marcus*, 560 U.S. at 262.

Here, we need only examine the third factor to conclude that no plain error occurred. As the district court recounted, the "instructions concerning quid pro quo and official action, along with the additional instructions given by the Court concerning the specific findings required by the verdict sheet, still sufficiently conveyed the requirements of *Silver II*." *Mangano*, 2022 WL 65775, at *32. First, as to the specificity requirement of *Silver II*, the jury was instructed it must "specify" and "indicate" whether the "goal of the conspiracy charged in Count 3 was to commit honest services wire fraud as to the alleged . . . [Town] Loan Scheme." A-231, A-250. This instruction guaranteed that the jurors properly considered whether Mangano promised to take action on "a *specific and focused question or matter* as the opportunities to take such action arose." *Silver II*, 948 F.3d at 568. Likewise, the instructions as to the principal honest services fraud charged in Count Four specifically identified the Town loan guarantees scheme as the relevant question or matter. A-156–57.

Second, as to *Silver II*'s timing requirement, we agree with the district court that the government provided "overwhelming evidence that, in April 2010, Mangano promised to take official action concerning the [Town loan scheme] in exchange for Singh's hiring of Linda Mangano at a salary of $100,000 a year." *Mangano*, 2022 WL 65775, at *36. This evidence included the circumstantial timing of Linda Mangano's hiring within days of Sinnreich's email identifying the illegality of the loan guarantees and the immediately subsequent official actions by Mangano to try to secure the guarantees anyway. *Id.*; *see also Silver II*, 948 F.3d at 557 ("Circumstantial evidence demonstrating an understanding between the payor and the official will often be sufficient for the Government to identify a properly focused and concrete question or matter.").

We therefore fail to see any "reasonable probability" that the absence of *Silver II*'s timing and specificity language could have "affected the outcome of the trial." *Marcus*, 560 U.S. at 262. As a result, we conclude that omitting the precise language from *Silver II* was not plain error.

Moreover, stepping back from the analysis of whether any alleged error might have affected the proceedings, it bears repeating that the *Silver II* panel "determined that the 'as the opportunities arise' theory of bribery survives

68

*McDonnell*." 948 F.3d at 558. At bottom, Mangano's arguments contend that *Silver II* fundamentally changed the elements of honest services fraud offenses. In fact, the opinion "simply clarifies, without altering, the 'as opportunities arise' doctrine that has long been part of our circuit precedent," *id.* at 577–78 (Lohier, *J.*, concurring), explaining legal requirements that the jury instructions in this case accurately conveyed.

Finally, in addition to these jury instructions challenges, Mangano argues the evidence of the alleged quid pro quo's timing and specificity was insufficient to convict him. But as discussed above, the government provided abundant evidence that, at the time Singh began bribing Mangano by paying L. Mangano for a no-show job, Mangano agreed to take official action on the specific matter of Singh's sought-after loan guarantees by, among other things, pressuring Town officials to work with Rivkin Radler and "find a way to help Mr. Singh" obtain them. A-1673. This evidence, contrary to Mangano's claim on appeal, was sufficient.

### D. Official Act

Mangano next claims that the district court erred in instructing the jury that he committed an "official act" if he "provid[ed] advice to another." Mangano

Br. 11.   According to him, the only sort of advice that can amount to an official

act involves "formalized recommendations of subordinates who had specialized

knowledge or expertise" in situations where "their superiors 'would necessarily

rely largely upon the reports and advice of subordinates.'"   *Id.* at 50 (emphasis

omitted) (quoting *McDonnell*, 579 U.S. at 572, which in turn quoted language from

*United States v. Birdsall*, 233 U.S. 223, 234 (1914)).   In his view, "if one public

official has no formal or official relationship with another, he essentially acts as a

private party in advising or seeking to 'pressure' the other official."   Reply Br.

25.   For the following reasons, we disagree.

As the trial court instructed the jury:

> An "official act" or "official action" is a decision or action on a specific
> matter that may be pending or may by law be brought before a public
> official.   An official act must involve a decision, an action, or an
> agreement to make a decision or to take action.   The decision or
> action may include using one's official position to exert pressure on
> or to order another to perform an official act.   It may also include
> using one's official position to provide advice to another, knowing or
> intending that such advice will form the basis for an official act by
> another . . . .

A-220–21.   This instruction accurately tracks the relevant language in *McDonnell*,

579 U.S. at 572, which states that:

> [A] decision or action to initiate a research study—or a decision or
> action on a qualifying step, such as narrowing down the list of

70

potential research topics—would qualify as an "official act." A public official may also make a decision or take an action on a "question, matter, cause, suit, proceeding or controversy" by using his official position to exert pressure on *another* official to perform an "official act." In addition, if a public official uses his official position to provide advice to another official, knowing or intending that such advice will form the basis for an "official act" by another official, that too can qualify as a decision or action for purposes of § 201(a)(3). *See United States v. Birdsall*, 233 U.S. 223, 234 (1914) (finding "official action" on the part of subordinates where their superiors "would necessarily rely largely upon the reports and advice of subordinates . . . who were more directly acquainted with" the "facts and circumstances of particular cases").

Because the district court's jury instructions reflect the correct legal standard described in *McDonnell*, we discern no possibility that they failed to "adequately inform the jury on the law." *Roy*, 783 F.3d at 420. Moreover, we have no fear that the jury might have convicted Mangano based on conduct that was not an "official act." *McDonnell* expressly recognizes that using one's official position "to exert pressure on another official to perform an 'official act,'" can qualify. *McDonnell*, 579 U.S. at 572. Here, Mangano pressured Venditto and Genova to perform the official act of passing a vaguely worded Town resolution that supplied apparent legal cover for the illegal guarantees Singh needed.

Mangano stakes his argument on the final *McDonnell* example, contending that he merely "provide[d] advice to another official" and then striving to distinguish *Birdsall*. Mangano Br. 50. But even if we agreed that the Supreme Court's citation to *Birdsall* narrowly limited the sort of advice that can be an official act, which we do not, it would not help his cause, given the clear evidence of Mangano "exerting pressure on another official to perform an official act."[17] Further, to claim that Mangano merely provided advice to Town officials would grossly understate his role in orchestrating the loans scheme.

In rejecting Mangano's jury instructions challenge, we recognize that we have reached a similar conclusion before, where a defendant "us[ed] [his] influence as a high ranking state official to push through county legislation and to bestow a county-issued contract," deeming such pressure an "indisputably formal exercise[] of governmental power constituting [an] official act." *United*

---

[17] To be sure, we do not agree that the advice example in *McDonnell* is limited to scenarios like *Birdsall*, where a bribed inferior gave advice to a superior official, knowing it would be relied upon. In fact, it seems just as likely, if not more so, that advice from a superior officer would form the basis of an inferior officer's decisions and amount to an official act. Either way, the Supreme Court used a "see" citation, suggesting that *Birdsall* merely supports, rather than directly states, the proposition that advice can be an official act. So Mangano's argument that the advice in *Birdsall* is distinct from the advice he provided to the Town simply has no bearing on whether his actions amounted to official acts.

72

*States v. Skelos*, 707 F. App'x 733, 739 (2d Cir. 2017) (summary order). Though that case was non-precedential, we reiterate its holding with approval.

### E. Statute of Limitations

Mangano also contends that the honest services fraud charges are time-barred by the statute of limitations and should have been dismissed. However, Mangano never pursued a statute of limitations defense at trial nor sought an instruction on the statute of limitations—even after the first trial, which gave him full notice that the government's case on the Town loan guarantees scheme relied on an "as opportunities arise" theory and the ongoing payments to Linda Mangano to satisfy the statute of limitations. At that point, Mangano had "ample incentive to press a statute of limitations defense and seek an instruction on that defense." *Mangano*, 2022 WL 65775, at \*30. Indeed, the district court concluded that Mangano's decision not to raise this issue at trial was "clearly a strategic one" because doing so would have "risked undermining his primary defense that he did nothing illegal at all and that the jury should also acquit him of the charges concerning Singh's two Nassau County Contracts, both of which were clearly timely." *Id.* As a result, when considering Mangano's post-trial motions regarding the statute of limitations applicable to his honest services fraud

convictions, the district court determined that Mangano waived or at the very least forfeited this argument. *Id.*

We disagree with the district court's conclusion that Mangano waived his statute of limitations argument as to the sufficiency of the evidence. He squarely argued, before the first trial, that the honest services fraud-related counts against him should be dismissed because the 2010 loan guarantee occurred outside the statute of limitations period. The district court denied this motion, determining that the government "need not prove that an official act occurred within the statute of limitations period" and instead would only have to "prove that some aspect of the particular *quid pro quo* scheme continued into the statute of limitations*." Mangano*, 2022 WL 65775, at *25 (quoting *Silver I*, 864 F.3d at 122). Thus, because Mangano's "limitations argument is premised upon a legal position that he had argued unavailingly to the district court in a pretrial motion," and that position is "purely an issue of law," we conclude that Mangano did not "waive[] the limitations defense by failing to request a jury instruction." *Vebeliunas*, 76 F.3d at 1292.

Nevertheless, applying *de novo* review to the district court's legal conclusions as to the statute of limitations, *see City of Pontiac Gen. Emp.'s Ret. Sys. v.*

74

*MBIA, Inc.*, 637 F.3d 169, 173 (2d Cir. 2011), we agree with the district court's conclusion in the alternative that the statute of limitations was satisfied in this case. *See Mangano*, 2022 WL 65775, at *24, *36–40. As to the principal honest services fraud charged in Count Four, the limitations period began on October 18, 2011. *See* 18 U.S.C. § 3282 (setting a five-year statute of limitations for non-capital federal offenses); *see also* A-47 (indictment dated October 18, 2016). After that date, L. Mangano received dozens of paychecks from Singh as part of his as-opportunities-arise quid pro quo with Mangano regarding the Town loan guarantees scheme. "The Government need only prove that some aspect of the particular *quid pro quo scheme* continued into the statute of limitations period," *see Silver I*, 864 F.3d at 122, and the government did so in this case with the evidence of Singh's ongoing payments to L. Mangano.

The same reasoning applies to the honest services fraud conspiracy charged in Count Three. For a conspiracy charge, which "requires proof of an overt act, the government satisfies the statute of limitations . . . if it establishes that the conspiracy operated within the five-year period preceding the indictment, and a conspirator knowingly committed at least one overt act in furtherance of the scheme within that period." *United States v. Salmonese*, 352 F.3d 608, 614 (2d Cir.

75

2003).   But because conspiracy to commit honest services fraud is not the sort of conspiracy which requires an overt act, *see Roy*, 783 F.3d 420–21, the government can satisfy the relevant statute of limitations up until an honest services fraud conspiracy's "objectives have either been accomplished or abandoned, not when its last overt act was committed," *United States v. Grammatikos*, 633 F.2d 1013, 1023 (2d Cir. 1980) (addressing a different conspiracy statute that similarly lacked an overt act requirement).

Evidence of Singh's ongoing payments to L. Mangano suffices to satisfy the statute of limitations for Count Three.   The district court highlighted that, "when the Manganos received Linda Mangano's October 23, 2011 paycheck (as well as her subsequent paychecks thereafter), Mangano undoubtedly continued to understand that these payments were made, at least in part, for his intervention with the [Town], which led to her being placed on Singh's payroll in the first place."   *Mangano*, 2022 WL 65775, at *39.   In other words, the evidence amply demonstrated that Singh bribed Mangano to take official action on the Town loan guarantees scheme, not with a couple of paychecks to Linda Mangano in April 2010, but rather by giving Linda Mangano "a 'no-show job' that was obviously expected to continue."   *Id.*   In leaving his law firm to represent the people of

76

Nassau County, Mangano had sustained a steep drop in annual income of at least $100,000 a year, and Singh testified that "the purpose of . . . giving Linda Mangano a job [wa]s to compensate for his salary reduction from the law firm to [] being a county executive . . . so he can help me out." *Id.* (quoting A-1354). This objective had not been satisfied as of October 18, 2011, considering that Mangano continued to earn less than his family's lifestyle required and would continue to earn less for the duration of his time in office. Nor did Singh's need for Mangano end by October 11, 2011. The conditions on the June 2010 and May 2011 loans left Singh requiring additional funding—and therefore the contracts with "Mangano's fingerprints . . . all over" them—to pay off his outstanding capital improvement obligations. A-2332. As a result, the conspiracy's goal had neither been achieved nor abandoned before the limitations period began to run.

These facts readily distinguish the Town loan guarantees scheme from the *Silver II* scheme that we concluded to have exceeded the statute of limitations. 948 F.3d at 573–74. In that case, the defendant expressly told his briber, outside the applicable statute of limitations period, that he could no longer provide official acts on the specific matter of certain state grants because of a change in

77

New York's conflict of interest laws, but the briber nevertheless continued to send bribes into the limitations period. The briber testified that these later bribes were merely intended to "curry generalized goodwill." *Id.* at 573; *see also id.* at 561 (noting email from the briber stating, "I will keep giving cases to [Silver] because I may need him in the future"). This evidence demonstrated that the ongoing bribes in that case were not tied to the specific matter—*i.e.*, state grants—that served as the initial quo for which Silver accepted quid.

Here, by contrast, there was no analogous clear and definite end to the scheme in which Mangano accepted L. Mangano's no-show job salary in exchange for his promise to intervene on Singh's behalf regarding the Town loan guarantees. In fact, the Town continued backing Singh's loans well into the limitations period, with cover from the resolution that the Town passed on Mangano's urging and via contractual language designed by the counsel that Mangano secured. Moreover, unlike the briber in *Silver II*, Singh did not testify that L. Mangano's ongoing paychecks were only intended to curry generalized goodwill or to help with unspecified future matters. Rather, he testified that "I hired Linda Mangano because I needed this loan guarantee done from [the Town]. So when Ed [Mangano] was on board and supported this loan, when he

78

requested me to help him financially, obviously it was a mutual benefit. So . . . I complied with that [request]." A-1158. We therefore agree with the district court's conclusion that the evidence sufficiently demonstrated that "Mangano understood that Linda Mangano's paychecks after April 2010 were, at least in part, in exchange for Mangano's earlier (and, if necessary, future) intervention with the Town loan guarantees." *Mangano*, 2022 WL 65775, at *42.

Even if the payments to L. Mangano were insufficient to satisfy the statute of limitations, the district court also highlighted that, in October 2012—well within the limitations period—Mangano lied on his annual financial disclosure statements for Nassau County. *Id.* at *43. Specifically, he claimed that Linda Mangano had a marketing position at one of Singh's restaurants and earned over $100,000 in that role, which the district court characterized as "an attempt to lull Nassau County and the citizens of Nassau County (including those citizens living in the [Town]) from discovering Mangano's bribery scheme." *Id.* We agree that this act was "in furtherance of th[e] scheme" involving the Town loan guarantees. *Id.* Thus, based on the payments Singh sent to L. Mangano during the limitations period, the additional guarantees the Town provided Singh under the auspices of the resolution Mangano helped get passed, and the misleading

79

disclosures Mangano filed in 2012, we reject Mangano's argument that the statute of limitations was not satisfied as to his honest services fraud convictions.

## IV. Obstruction of Justice

Both Mangano and L. Mangano argue that the jury instructions on their obstruction of justice-related charges failed properly to communicate the nature of the nexus requirement established by the Supreme Court in *United States v. Aguilar*, 515 U.S. 593 (1995). Each defendant also asserts that the evidence was insufficient to prove that the nexus requirement was satisfied. We disagree and affirm their convictions.

Count Eight of the operative indictment charged L. Mangano with violating 18 U.S.C. § 1512(c)(2), which criminalizes obstructing, influencing, or impeding any "official proceeding" or attempting to do so. Count Seven charged both L. Mangano and Mangano with violating 18 U.S.C. § 1512(k), which criminalizes conspiracies of the same ilk. An "official proceeding" includes "a proceeding before a judge or court of the United States . . . or a Federal grand jury." 18 U.S.C. § 1515(a)(1)(A). In *Aguilar*, the Supreme Court held that, to convict a person of obstructing a federal grand jury proceeding, the evidence must show that the appellant's conduct had "a relationship in time, causation, or logic with

the [grand jury] proceedings." 515 U.S. at 599. This court has since held that *Aguilar*'s so-called "nexus" requirement applies to 18 U.S.C. § 1512(c)(2). *See United States v. Reich*, 479 F.3d 179, 185–86 (2d Cir. 2007).

To satisfy this nexus requirement, an alleged obstruction of justice "'must have the natural and probable effect of interfering with the due administration of justice.'" *Id.* at 185 (quoting *Aguilar*, 515 U.S. at 599). We have therefore found this requirement satisfied in instances where "a grand jury proceeding was 'foreseeable' because the defendant was aware 'that he was the target of an investigation.'" *United States v. Binday*, 804 F.3d 558, 590 (2d Cir. 2015) (quoting *United States v. Persico*, 645 F.3d 85, 108 (2d Cir. 2011)), *abrogated on other grounds by Ciminelli v. United States*, 598 U.S. 306 (2023).

In its instructions to the jury, the district court explained that:

> The government must prove that the defendant knew that her actions were likely to obstruct, influence or impede a federal grand jury investigation. The government must also prove that the defendant intended to obstruct, influence, or impede a federal grand jury investigation. The law does not require that the federal grand jury investigation be pending at the time of the defendant's actions as long as a federal grand jury investigation was foreseeable such that [the] defendant knew that her actions were likely to affect the federal grand jury investigation.

81

A-236.  According to the Manganos, however, the jury should have been additionally instructed that "merely 'uttering false statements to an investigating agent who may or may not testify before the grand jury' is not sufficient to satisfy this [nexus] element."  *See Mangano*, 2022 WL 2872670, at *8 (quoting the Manganos' proposed jury instructions (quoting *Aguilar*, 515 U.S. at 599–600)).

The district court reviewed that argument under a plain error standard, considering that Linda Mangano never proposed instructions as to the obstruction of justice charge and that neither defendant ever objected to the Court's obstruction of justice instructions.  While we agree with the district court's decision to review the instructions for plain error, we need not quibble over the applicable standard because the instructions contained no error at all. Even applying *de novo* review of a jury instruction, we may reverse only "where the charge, viewed as a whole, either failed to inform the jury adequately of the law or misled the jury about the correct legal rule."  *Binday*, 804 F.3d at 580–81 (quoting *United States v. White*, 552 F.3d 240, 246 (2d Cir. 2009)).  Here, the charge adequately informed the jury of the standard we apply in this circuit to determine if the nexus requirement is met—that it had to find that "a grand jury proceeding was foreseeable," *Binday*, 804 F.3d at 590, such that the Manganos' actions would

"have the natural and probable effect of interfering with the due administration of justice," *Reich*, 479 F.3d at 185 (quoting *Aguilar*, 515 U.S. at 599).

We have found such a nexus where a defendant emailed his staff to endorse a suggestion to destroy documents that might eventually be subpoenaed by a grand jury. *See United States v. Quattrone*, 441 F.3d 153, 166, 172 (2d Cir. 2006). We have also found the required nexus where the defendant erased a hard drive after government agents questioned him about policies contained therein, even where there was no mention of the term "grand jury" nor that he was the target of a criminal investigation. *Binday*, 804 F.3d at 591. We have even found the nexus where no official proceeding was yet pending but the arrests of coconspirators made it foreseeable to the defendant (a police officer), who was monitoring and reporting such arrest warrants to his coconspirators, "that there would be a grand jury proceeding leading to numerous indictments." *United States v. Martinez*, 862 F.3d 223, 238 (2d Cir. 2017), *judgment vacated sub nom. Rodriguez v. United States*, 139 S. Ct. 2772 (2019). In all these cases, we have focused on whether it was foreseeable to the defendant that his conduct would have a natural and probable effect of obstructing the proceedings. It was

83

therefore appropriate for the district court to instruct the jury that such foreseeability was a necessary element of the charge.

Mangano contends that the court should have instructed the jury that "false statements to an investigating agent who might or might not testify before the grand jury" would not be sufficient to make out a violation of the statute. Mangano Br. 94 (quoting *Aguilar*, 515 U.S. at 600). This argument misreads *Aguilar*. The cited language related to the facts of that case, where "all that was proved" was that the defendant (a federal judge) had "utter[ed] false statements to an investigating agent . . . who might or might not testify before a grand jury." *Aguilar*, 515 U.S. at 600. But the Supreme Court recognized that, if the government had produced other evidence that Aguilar knew his actions would have the "natural and probable effect of interfering with the due administration of justice," then the requisite "nexus" requirement might be met. *See id.* at 601 (internal quotation marks omitted). Here, the government *has* produced such evidence, in the form of Singh's testimony regarding the Manganos' meeting with him to craft a false narrative for the agents who subpoenaed L. Mangano about her no-show job. *Aguilar*'s case-specific dicta about a situation where all that was proved was the defendant "utter[ed] false statements" is thus inapposite to

84

the case at hand.   Perhaps Mangano knows as much, as he cites no case law commanding the instruction he seeks.   Although such case law is not necessarily required in *de novo* review, it would be necessary to show plain error.   *See United States v. Weintraub*, 273 F.3d 139, 152 (2d Cir. 2001).

L. Mangano argues that she was "entitled to have the court charge the jury on any defense theory for which a foundation existed in the record."   L. Mangano Br. 29 (quoting *United States v. Brand*, 467 F.3d 179, 205 (2d Cir. 2006). But it is also true that a defendant is "not necessarily entitled to have that instruction communicated to the jury in the language of his choice."   *United States v. Salerno*, 66 F.3d 544, 549 (2d Cir. 1995).   "Rather, a charge is sufficient if it adequately appraises the jury of the crime and the defense."   *Id.* (quoting *United States v. Johnson*, 994 F.2d 980, 988 (2d Cir. 1990).   This charge did just that, so her challenge fails.

To the extent each defendant likens this case to the situation in *United States v. Schwarz*, 283 F.3d 76, 109 (2d Cir. 2002), we find that case plainly distinguishable.   There, we observed that "there was no showing that [the defendant], who had been subpoenaed only for his memo book, knew that the allegedly false statements he made to the federal investigators on November 8,

1997 would be conveyed to the federal grand jury. [The defendant] had not himself been called to testify and there is no evidence that the investigators gave him any indication that they would repeat his statements to the grand jury." *Id.* In this instance, however, L. Mangano *had* been called to testify, and there *was* evidence that the investigators gave her indications that they would repeat her statements to the grand jury. Indeed, Agent Spence, the agent who served L. Mangano the subpoena requesting her testimony about her work for Singh, was the agent to whom L. Mangano made false statements about her work for Singh. Moreover, the government provided evidence that the Manganos' instant response to receiving the subpoena was to call Singh and meet with him, "because they were going to tell the story to the FBI . . . and [Singh] was going to tell the FBI the same things." A-1245. The trio repeated this activity twice more in the nights leading up to Linda's meeting with the government in response to the subpoena, "coming [up] with a story" for L. Mangano "to tell the government." A-1246–47.

Each defendant's sufficiency argument fares no better. Construing the evidence in the light most favorable to the government, we have no trouble concluding that any rational trier of fact could have determined that the

Manganos concocted a false narrative about L. Mangano's no-show job with Singh to impede the grand jury investigation into Mangano's bribery offenses. We therefore affirm their convictions as to conspiracy to obstruct justice as well as L. Mangano's conviction as to the obstruction of justice.

**V. False Statements**

L. Mangano argues that, because there is no verbatim record of the allegedly false statements she made to federal officials, the evidence is insufficient to sustain her conviction under 18 U.S.C. § 1001(a)(2).   We disagree.

"[I]n order to secure a conviction under [18 U.S.C.] § 1001(a)(2), the Government must prove that a defendant (1) knowingly and willfully, (2) made a materially false, fictitious, or fraudulent statement, (3) in relation to a matter within the jurisdiction of a department or agency of the United States, (4) with knowledge that it was false or fictitious or fraudulent."   *United States v. Litvak*, 808 F.3d 160, 170 (2d Cir. 2015) (citations, internal quotation marks, and emphasis omitted).

We find the evidence sufficient to affirm L. Mangano's false statements conviction.   First, a verbatim recording or transcript is not necessary to prove the offense of false statements.   *See, e.g.*, *United States v. Sorich*, 523 F.3d 702, 717 (7th

87

Cir. 2008) (stating that "there is no requirement that a conversation be transcribed or recorded in order to support a conviction under § 1001" and rejecting the argument that witness's "questions were fundamentally ambiguous and untrustworthy, given his reliance on his notes rather than a transcript or recording of the interview"); *United States v. Fern*, 696 F.2d 1269, 1275–76 (11th Cir. 1983) (affirming Section 1001 conviction where there was no verbatim account of the false statement). Although our circuit has never expressly held as much in a precedential opinion, we, too, have affirmed false statements convictions where a word-for-word transcript of the allegedly false statement was not introduced at trial. *See, e.g.*, *United States v. Sampson*, 898 F.3d 287, 305–06 (2d Cir. 2018) (affirming conviction where a federal agent testified to an exchange with the defendant); *United States v. Ramsey*, No. 23-7211-CR, 2024 WL 5199288, at \*3 (2d Cir. Dec. 23, 2024) (same). We therefore have no qualms in determining that the absence of a verbatim transcript is not, by itself, reason to find that the evidence of a false statement is insufficient.

Moreover, the jury heard substantial testimony that the federal officials to whom L. Mangano made statements accurately recorded the material substance of what she said. Agent Spence testified that, at the May 20, 2015 proffer session,

"if [L. Mangano] had made a statement and I didn't quite get what she was saying because it was too quick, I would ask her to slow down, speak slowly, and maybe repeat what in fact she said so I could make sure I'm accurate." A-1073. She also testified that the point of taking these notes "was to make sure I'm accurately writing down what [L. Mangano's] saying during the interview." A-1074. The notes were reviewed by another agent who was present during the proffer, as well as by a supervisor. *Id.* Agent Spence followed the same procedures for the notes she took at the May 22, 2015 proffer session. A-1076. Where, as here, a defendant challenges the sufficiency of the evidence that her statements were false, ambiguity with respect to both questions posed and the answers given are questions of fact that the jury, as the factfinder, resolves. *See United States v. Lighte*, 782 F.2d 367, 372–73 (2d Cir. 1986) (explaining that, in a perjury case, a jury must "determine whether the question—as the declarant must have understood it giving it a reasonable reading—was falsely answered"). Because "any rational trier of fact" could determine that this evidence proved Agent Spence's notes accurately recounted L. Mangano's statements, we reject her sufficiency of the evidence argument. *Aguilar*, 585 F.3d at 656.

To the extent L. Mangano argues that the government failed to demonstrate that her statements to Agent Spence during the proffer sessions were not "literally true," *see United States v. Mandanici*, 729 F.2d 914, 921 (2d Cir. 1984) (citing *Bronston v. United States*, 409 U.S. 352, 359–52 (1973)), we are not persuaded. At the outset, we note that we have not squarely decided whether a conviction under 18 U.S.C. § 1001 requires the statements at issue to be literally false, and we decline to do so today. *See Sampson*, 898 F.3d at 306 n.14; *United States v. Kaplan*, 758 F. App'x 34, 39 (2d Cir. 2018) (summary order).

Even assuming *arguendo* that the government had to show L. Mangano's statements were literally false, it clearly did so here. Numerous witnesses testified that L. Mangano did not appear for work at Water's Edge three or four times when she first started receiving paychecks from Singh. Documents and testimony by a design company proved that her claim to have designed the Besi menu was not true. Her then-colleagues testified that she did not work two days a week at a new company. Her claim that she told Singh she was leaving his employment in April 2014 was also refuted by Singh's own testimony and undermined by subsequent paychecks that she received and cashed. Even the assemblymember whom she claimed would have paid her $80,000 per year

90

testified, under oath, that he would not have done so.   L. Mangano had the opportunity to cross-examine all these witnesses, and the jury ultimately determined that the totality of the evidence demonstrated she had lied to Agent Spence during the May 2015 proffer sessions.

L. Mangano suggests that the government failed to prove her statements were literally false because Agent Spence's notes represented the "sum and substance" of what she said, rather than the actual words.   But we cannot see how she could have stated any of the above claims in a literally true way based on the substantial trial evidence demonstrating that the claims were demonstrably false, in sum and substance.   In *Bronston*, the Supreme Court reversed a perjury conviction founded on a defendant answering the question "have you ever [had a Swiss bank account]?" with the statement "the company had an account [in a Swiss bank] for about six months."   409 U.S. at 354–55. That kind of statement was of a sort that can be literally true, even if misleading. *Id.* at 362.   The statements L. Mangano made, by contrast, could only have been literally true if the jury disregarded the mountain of evidence that they were false. This distinction defeats her claim, and we therefore affirm her false statements convictions.

## CONCLUSION

For the foregoing reasons, and for the reasons provided in the separate summary order filed today that addresses the remaining claims, we **REVERSE** Mangano's conviction as to Counts One and Two of the indictment, **AFFIRM** his convictions and L. Mangano's convictions as to all other counts, and **REMAND** the case to the district court for further proceedings consistent with this opinion and the related summary order filed today.